UNITED STATES of America ex rel. Kathryn M. MILAM

v.

The REGENTS OF the UNIVERSITY OF CALIFORNIA, University of California, Brain Tumor Research Center, Charles B. Wilson, Laurence J. Marton, Dennis F. Deen, Burt G. Feuerstein, The University of Texas M.D. Anderson Cancer Center, Philip J. Tofilon.

Civil No. B–90–523.

United States District Court, D. Maryland.

Oct. 6, 1995.

Alan S. Weitz, Madonna A. McGwin, Nadine Greenzaid, John E. Schwarz, Ginsburg, Feldman and Bress, Washington, DC, Donna Sanger, Assistant U.S. Attorney, Baltimore, MD, Laurence J. Freedman, Michael F. Hertz, Ronald H. Clark, Dara A. Corrigan, U.S. Department of Justice, C.L.B./Civil Division, Washington, DC, for Plaintiff.

Carmen M. Shepard, Assistant Attorney General, Baltimore, MD, Kathlyn C. Wilson, J.D. Hooper, James C. Todd, General Litigation Division, Austin, TX, for Defendants Tofilon: and the University of Texas M.D. Anderson Cancer Center.

William A. McDaniel, Jr., Murphy & McDaniel, Baltimore, MD, James E. Holst, John F. Lundberg, University of California, Oakland, CA, Robert P. Charrow, Tom Watson, Lisa A. Price, C. Robert Manor, Crowell & Moring, Washington, DC, for Remaining Defendants.

## OPINION

WALTER E. BLACK, Jr., Senior District Judge.

■ Presently pending before the Court are a Motion for Judgment on the Pleadings (Paper 77) and a Motion for Summary Judgment or in the Alternative, Partial Summary Judgment (Paper 81) filed on behalf of defendants Regents of the University of California, Charles B. Wilson, Laurence J. Marton, Dennis F. Deen, Burt G. Feuerstein, and Philip J. Tofilon ("the California defendants"). Also pending is a Motion for Summary Judgment (Paper 82) filed on behalf of defendants University of Texas M.D. Anderson Cancer Center and Philip J. Tofilon ("the Texas defendants"). Kathryn M. Milam filed this *qui tam* action as relator on behalf of the United States, pursuant to 31 U.S.C. § 3730, the False Claims Act, on February 14, 1990.[1] In the amended complaint, Milam alleges that defendants Regents of the University of California, University of California at San Francisco, Brain Tumor Research Center, Charles B. Wilson, Laurence J. Marton, Dennis F. Deen, Burt G. Feuerstein, Philip J. Tofilon, and University of Texas M.D. Anderson Cancer Center submitted false data and false claims for payment in connection with grant applications to the United States between 1982 and the time the suit was filed. In particular, Milam alleges

---

1. A cause of action arises under the False Claims Act if an individual or institution knowingly presents a false or fraudulent claim for payment or makes a false statement to get a false or fraudulent claim paid or approved by the government. 31 U.S.C. § 3729(a). A private party may assert a claim under the False Claims Act in the name of the United States government, but the complaint must be filed in camera and under seal and served on the government so that the government has the opportunity to intervene. 31 U.S.C. § 3730(b)(2). The private party may elect to pursue the case even if the government declines to intervene. 31 U.S.C. § 3730(c)(3). Here, the United States notified the Court that it would not intervene in the pending case. *See* 31 U.S.C. § 3730(b)(4)(B).

that defendants falsified data regarding brain tumor research, and then continued to submit grant applications to the National Institutes of Health ("NIH") and receive funds from NIH based on this falsified data. The essence of the dispute between the parties is reflected in the different ways they characterize the events of the past thirteen years: relator sees this as a case of scientific misconduct and intentional fraud, while defendants view the case as a scientific dispute. Defendants have filed the pending summary judgment motions in which they claim that Milam has failed to produce any evidence from which a rational trier of fact could conclude that defendants knowingly submitted any false claims to the government.

## I

■ Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment is granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 884, 110 S.Ct. 3177, 3186–87, 111 L.Ed.2d 695 (1990). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). It is not "a disfavored procedural shortcut," but rather the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327, 106 S.Ct. at 2555. However, under the strict standard of the Fourth Circuit, summary judgment is inappropriate even if merely the inferences to be drawn from the facts are in dispute. *Morrison v. Nissan Motor Co., Ltd.,* 601 F.2d 139, 141 (4th Cir.1979).

■ The Court must thus decide whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant. *Helm v. Western Maryland Railway Co.,* 838 F.2d 729, 734 (4th Cir.1988); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It should be noted, however, that "the judge's function is not himself to weigh the evidence and determine the truth of the matter." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511; *see Miller v. Leathers,* 885 F.2d 151, 154 (4th Cir.1989), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Instead, the Court must simply decide whether there is a genuine issue for trial.

■ The non-movant may prove the existence of a genuine issue by reference to the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *See* Fed.R.Civ.P. 56(c). As instructed by the court in *Anderson,* the non-movant must present "significant probative evidence tending to support the complaint." 477 U.S. at 249, 106 S.Ct. at 2510. The non-movant cannot satisfy this burden by simply showing a mere metaphysical doubt about the facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988).

## II

In the early 1980's defendant Wilson, a neurosurgeon and the Chairman of the Department of Neurological Surgery at the University of California at San Francisco ("UCSF"), was the director of the Brain Tumor Research Center ("BTRC"), a research facility at UCSF. The primary funding source for BTRC is grant funds from NIH. Defendant Deen, a Professor of Neurological Surgery and Radiation Oncology, is the Associate Director and Principal Investigator in one of BTRC's laboratories. Deen's laboratory was researching the use of x-rays in treating brain tumors. Defendant Tofilon, who had received his doctoral degree in pharmacology, was an Assistant Research Pharmacologist in Deen's laboratory from 1981 through 1984. In June, 1984, Tofilon transferred to the M.D. Anderson Cancer

Center at the University of Texas.[2] Defendant Marton, a Professor and the Chairman of the Department of Laboratory Medicine at UCSF, was a Principal Investigator for a laboratory at BTRC. Marton's laboratory focused on chemotherapy research. Because Deen's and Marton's laboratories were doing similar research involving brain tumor therapy, they collaborated on their research efforts. Defendant Feuerstein, an Assistant Professor of Laboratory Medicine, was another BTRC Principal Investigator. Relator Milam, a scientist who had received a doctoral degree in nutrition and physiological chemistry, was a researcher in Marton's laboratory between November, 1984, and August, 1988.

The experiments at issue in this case were designed to discover why the effectiveness of the drug BCNU [3], a cytotoxic or cell-killing agent, which is known to be effective in the treatment of brain tumors, was enhanced when administered in conjunction with other drugs or treatments. By the early 1980's, scientists had already established that x-irradiation and polyamine [4] inhibitors, including the drug DFMO [5], enhance the cell-killing effect of BCNU on brain tumor cells. Therefore, treatment of brain tumor cells with both BCNU and DFMO, or both x-rays and BCNU, increased the cytotoxicity of a dosage of BCNU. The unanswered question was why the interaction improves the effectiveness of BCNU. Marton hypothesized that pretreatment with DFMO affects the structure of deoxyribonucleic acid ("DNA") in the brain tumor cells, and thereby enhances the cell-killing effect of BCNU. Deen formed a similar hypothesis that x-rays enhance the cytotoxicity of BCNU because of its effect on the structure of DNA molecules in brain tumor cells. Their hypotheses were significant because, if true, future studies should focus only on drugs that affect the structure of DNA molecules.

Marton and Deen chose similar experiments to test their theories. Cultures of rat brain tumor cells would be treated with BCNU and DFMO or BCNU and x-rays. The results would be compared to rat brain tumor cells treated with BCNU alone. Two assays, sister chromatid exchange ("SCE") and DNA interstrand cross-linking, would be used to measure the differences in damage to the DNA in the brain tumor cells. According to the hypotheses of Marton and Deen, changes in the structure of the DNA would affect the interaction of BCNU with DNA, and the increase in BCNU's cytotoxicity would be reflected by an increase in both SCEs and DNA interstrand cross-linking.

Tofilon was one of the first researchers to perform experiments to test the hypotheses. He performed four types of experiments: (1) a test of the effect of DFMO on BCNU-induced SCEs in brain tumor cells; (2) a test of the effect of DFMO on BCNU-induced DNA interstrand cross-linking; (3) a test of the effect of x-rays on BCNU-induced SCEs; and (4) a test of the effect of x-rays on BCNU-induced DNA interstrand cross-linking. Tofilon's results corresponded with the hypotheses and, in each case, Tofilon found that DFMO or x-irradiation significantly enhanced BCNU-induced SCEs and DNA interstrand cross-linking.

Tofilon conducted the first experiment in 1981. It involved placing cells treated with either DFMO and BCNU or cells treated with BCNU on a slide and counting chromosome aberrations under a microscope. A higher SCE count indicates greater chromosomal damage. Tofilon found that the number of SCE's induced by the drugs in combination was more than double the number of SCEs induced by DFMO and BCNU alone. Tofilon, Deen and Marton adhered to the following hypothesis to explain this outcome: "... if you remove the polyamines from the cell, ... you will destabilize the DNA thereby making [the cells] more susceptible to

2. After his transfer, Tofilon and the M.D. Anderson Cancer Center submitted grant applications to NIH based upon the research that Tofilon had done at BTRC. References to that work are the basis for Milam's claims against the Texas defendants.

3. Bischloroethylnitrosourea.

4. A polyamine is a compound in cells that is required for cell growth.

5. Difluoromethylornithine.

attack by BCNU." They published their results in the journal *Science* 217:1044 in 1982, and in *Cancer Research* 43:3576 in 1983.

The second experiment, conducted in 1982, involved a technique called the alkaline elution assay which measures cross-links between DNA strands by examining how long it takes DNA to pass through the filter. The results indicate the extent of DNA breakage. Tofilon published an article in *Science* 222:1132 (1983), with Marton and Deen as co-authors, which reported that BCNU and DFMO together caused a 93 percent increase in cross-linking.

The third experiment, like the first, used the SCE assay; however, this experiment investigated the effects of BCNU with irradiation instead of DFMO. Tofilon claimed that he found more SCEs with irradiation and BCNU together than he found with BCNU alone plus irradiation alone. He published his results in *Radiation Research* 97:171 (1984) with Deen as a co-author.

The fourth experiment, like the second, used the alkaline elution assay to measure DNA interstrand cross-linking; however, this experiment used radiation rather than DFMO. Once again, Tofilon found a greater than additive effect and, with Deen as a co-author, published his research results in *Radiation Research* 99:165 (1984).

In May, 1984, Tofilon finished his post-doctoral fellowship at UCSF and went to the M.D. Anderson Cancer Center of the University of Texas in June. Milam was hired at UCSF five months later. Milam was asked to replicate Tofilon's first study so that she could learn to perform the SCE assay. Her initial results revealed a greater than additive effect when BCNU and DFMO were used together. However, in February, 1985, Milam added a rinse step in which she rinsed off the DFMO-treated medium from the tumor cells before she added BCNU. Milam added the rinse step because she felt that the acidity of the medium was responsible for the variation in results that she was obtaining. From that point forward until December,

1985, Milam was unable to observe results as significant as those reported by Tofilon.

In late 1985, still unable to replicate Tofilon's research, Milam discontinued her own research. Deen and Marton suggested that she call Tofilon to discuss the discrepancies, but Milam failed to follow through on this suggestion because she felt that Deen and Marton, in light of their ongoing relationship, were in a better position to contact Tofilon and, in any event, she stated that she did not have his telephone number. Milam suggested that Dr. Sheldon Wolff's laboratory should look at the slides but, according to Milam, Marton declined her suggestion and told her to "drop it." [6]

However, according to Milam, in August, 1986, Marton or Deen suggested that Tofilon's original SCE slides be examined. They gave Milam an assistant, Shirley Horn, and together Milam and Horn rescored the slides. Milam found that the slides were not well prepared and that the slides did not reflect the SCE frequency reported in Tofilon's *Science* article.

Thereafter, Deen asked Tofilon to replicate the original BCNU–DFMO SCE experiment. In October, 1986, Tofilon sent a letter to Deen stating that his laboratory had replicated the results and that he observed a greater than additive effect. Deen admitted in his deposition that he did not trust Tofilon's results because Deen felt there were problems with the reported data, especially as to DFMO.

Tofilon provided his 1986 slides and data to BTRC and in May, 1987, Milam asked Dr. William Morgan, a researcher at Wolff's laboratory, to rescore Tofilon's 1981 and 1986 slides. Morgan asked Judy Bodycote, another researcher at Wolff's laboratory, to rescore the slides as well. Bodycote rescored the slides twice; the first time confirmed Tofilon's data, but Milam asked Bodycote to perform another rescoring because Bodycote had only examined ten of the twenty cells that Tofilon had scored. According to defendants, on the second rescoring, Bodycote could only confirm Tofilon's qualitative, not quantitative, findings. Her task

---

6. Wolff is Director of the Laboratory of Radiobiology and Environmental Health, a research facility at UCSF distinct from BTRC. He pioneered the sister chromatid exchange technique.

was made more difficult by the fact that the slides deteriorate with time. Milam, on the other hand, claims that Bodycote's second rescoring did not even confirm the qualitative finding. However, the record reflects that Bodycote's supervisor, Wolff, reported that Bodycote's second rescoring confirmed Tofilon's qualitative findings of a greater than additive effect. Morgan's rescoring showed a negligible increase in SCEs.

Milam alleges that the problem with the original Tofilon BCNU/DFMO SCE study was that the experiments chosen for publication were started on different days, that the experiments used different cell densities, and included different lengths of time for treatment with DFMO. Milam also claims that Tofilon, Marton, and Deen presented their results in such a way as to disguise the fact that these violations of scientific method had occurred. Thus, Milam claims that defendants "juggled the data and made comparisons where none could, or should, have been made." Eventually, as will be noted below, Wolff was able to replicate Tofilon's original study and to explain why Milam was unable to obtain similar results.

Milam also attempted to replicate Tofilon's alkaline elution assay using BCNU and DFMO. Once again, Milam included a rinse step in her protocol. Milam found a 30 percent increase in cross-linking when cells were treated with both BCNU and DFMO. However, she could not replicate the extent of Tofilon's results. Milam does not recall informing Marton and Deen of her difficulties; however, the record reflects that Marton and Deen were aware of Milam's lesser results by early 1986.

In 1987, Marton and Deen informed Dr. Leonard C. Erickson, a professor of medicine at Loyola University in Illinois, of the problems in replicating Tofilon's work in both the SCE and the cross-linking assays. Erickson repeated the cross-linking experiment with the same line of cells that Milam had used. In three separate experiments, he found that DFMO significantly increased BCNU induced cross-linking, although he did not find a 93 percent increase as reported by Tofilon. He also performed the same experiment with

a rinse step and found no increase in cross-linking.

The essence of Milam's claims regarding this experiment are that Tofilon's results varied widely but that he, Deen, and Marton selected the two most favorable experiments for publication in *Science* 222:1132 (1983). In particular, she claims that they did not report that some of Tofilon's experiments showed only a 30 percent enhancement in cross-linking.

Deen's laboratory also had difficulty replicating Tofilon's third experiment, the BCNU-radiation SCE experiment. Deen asked Dr. Christopher Selby, a post-doctoral fellow at BTRC, to attempt to replicate the third experiment. Selby performed the experiment but between December, 1986, and February, 1987, Selby did not observe the same effect that Tofilon had reported. Selby informed Deen of his problem in February, 1987.

In a further attempt to discover why Tofilon's results were not reproducible, Selby rescored Tofilon's original slides but, once again, he failed to observe the reported effect. Deen instructed Selby to send some of Selby's slides and some of Tofilon's original slides to Tofilon so that Tofilon could recount the effect. Tofilon's own recount could not confirm his original data. In August, 1987, Selby and Deen wrote a retraction and added Tofilon's name to the article. The article was published in *Radiation Research* 115:187 (1988) in July, 1988. In October, 1987, these problems were discussed in the presence of NIH staff, and on November 18, 1987, NIH was informed the retraction had been submitted.

Milam's primary concern with Tofilon's original *Radiation Research* article is that she believes the article was written so that readers would believe that, in each experiment, Tofilon performed four "treatment arms." In particular, each experiment would include (1) a no-treatment control, (2) BCNU alone (3) irradiation alone, and (4) irradiation and BCNU together. Milam now argues that a review of Tofilon's notebooks shows that the treatment arms were not performed at the same time and therefore could not be legitimately compared. She also points out that he did not blind score the slides, a

concern that Selby shared. Blind scoring involves coding the slides in an experiment so that the researcher does not know what type of slide he is scoring. There can be no suspicion of either deliberate or subconscious skewing of the results if slides are blind-scored. In fact, when Selby recoded the slides to assure blind counting, Tofilon could not confirm his own results. Because Tofilon failed to follow the appropriate methodology, Milam alleges that these experiments were "non-experiment[s] producing non-data," but that, nonetheless, defendants continued to report this data to NIH.

Milam did not attempt to replicate the BCNU-radiation cross-linking experiment. However, she believed that another researcher, Dr. Bhoomi Mehrotra, was having difficulty replicating Tofilon's work. Milam brought the matter to Deen's attention, who asked Dr. Aparajita Sarkar, a researcher, to attempt to replicate the experiment. Sarkar's research showed an enhancement in BCNU cross-linking when she irradiated the tumor cells after treatment with BCNU. In fact, Mehrotra also saw an increase in cross-linking, but not to the extent reported by Tofilon.

Milam has no concrete evidence to suggest that there were any problems with the fourth category of studies; however, she states: "[G]iven the problems with the rest of the experiments at issue, a trier of fact could reasonably infer that these experiments were also false at their inception and were falsely reported to NIH."

### III

On August 21, 1987, Marton informed Milam that he would not be able to offer her a permanent position at BTRC. On October 15, 1987, Milam filed a complaint at UCSF against Marton and Deen, claiming that she had been wrongfully terminated and that she was being fired as a result of tension created by the "scientific conflict" in regard to the Tofilon experiments. She accused Marton and Deen of failing to resolve satisfactorily the problems that she and Selby were having in replicating Tofilon's data.

UCSF asked Wolff to conduct an inquiry and informed Marton and Deen by letter that a complaint alleging professional misconduct had been filed against them. UCSF found that Milam was improperly terminated before the expiration of her contract and allowed her to remain an employee until her contract expired.

In order to investigate Milam's scientific claims, Wolff reviewed the data and interviewed witnesses. He completed the inquiry on November 6, 1987, and concluded that no fraud was involved in Tofilon's research. Wolff also found that Milam's complaint regarding the BCNU/DFMO cross-linking experiments addressed only the extent of the results, not the fact that an increase in cross-linking had occurred. Milam, for example, showed an increase in cross-linking of 30 percent, rather than the 93 percent found by Tofilon. As for the BCNU–DFMO SCE experiment, Wolff found the quality of slides to be of an extremely low quality "which could have led to the unconscious recording of data that could not be repeated."

Based on these findings, Milam, Deen, and Martin executed an agreement stating that (1) Selby, Deen, and Tofilon would immediately publish the retraction in *Radiation Research*; (2) Milam would prepare for publication her BCNU–DFMO cross-linking data; (3) Milam would prepare for publication her SCE data for BCNU and DFMO; (4) Martin would rescind his action in terminating Milam's employment in December, 1987, resulting in her employment until the end of August, 1988; and (5) Tofilon, Deen, and Martin had not committed any fraud.

Milam prepared an article for publication discussing her BCNU/DFMO SCE results, which she submitted to *Cancer Research*, a peer review journal, on May 8, 1988. It was not accepted by *Cancer Research* as a result of the fact that two reviewers had numerous significant questions about the validity of Milam's findings. Therefore, the journal declined to publish the article, suggesting that Milam's article was really a retraction that should be submitted to *Science*, the journal which published the original Tofilon article.

Milam therefore submitted the article to *Science* in October, 1988. *Science* did not accept the article for publication; instead,

the journal suggested that Milam write a short retraction of Tofilon's earlier work. On May 12, 1989, *Science* published a three-paragraph letter from Milam, Deen, and Marton, retracting part of Tofilon's 1982 article detailing the SCE frequency in cells treated with both BCNU and DFMO. The retraction also discussed problems with the DNA cross-linking data.

In early 1990, Tofilon informed Wolff that he had successfully replicated his results. However, he also found that if he added a rinse step, as Milam did, the results could not be replicated. Thereafter, in the summer of 1990, Wolff carried out three experiments which confirmed Tofilon's initial results. He determined that Milam had included a rinse step which was not part of the original protocol and was responsible for reducing the number of SCEs. Marton, Deen, and Tofilon also discovered why Milam could not replicate the SCE BCNU–DFMO research: the rinse step she added caused her results to deviate. They published their results in *Science* 258:1378 (1992). Wolff published his work in the journal *Mutation Research.*

However, Milam argues that Wolff did not replicate the results because he followed the protocol in the original article that Tofilon himself did not follow. Thus, according to Milam, it was not technically a replication; instead, Wolff's results were original, first time results. Furthermore, she claims that Wolff's results were not as dramatic as Tofilon's claimed results, although she has no support for this proposition in the record.

Milam also claims that the dispute over the rinse step is a "red herring," because

the polyamine level in the cell does not change for the one-hour BCNU treatment with or without the 'rinse step.' In other words, if Wolff now reports no 'Tofilon Effect' with a rinse step, and some Effect *(albeit* far reduced) without the rinse step, and since the polyamine level is the same in each case, then Defendants' entire polyamine/DNA theory is not supported.

Milam's counsel have included no support for her scientific theory. On the other hand, defendants have submitted evidence showing that Tofilon, Deen, Marton, and Wolff all confirmed that the rinse step caused the results to differ.

IV

Office of Research Integrity ("ORI")[7] at the Public Health Service reviewed the inquiries conducted at UCSF and a similar inquiry which was conducted at the M.D. Anderson Cancer Center. OSI investigated two issues: (1) "that Drs. Philip J. Tofilon, Dennis F. Deen, and Laurence J. Marton falsified results in publications" and (2) "that Drs. Philip J. Tofilon, Dennis F. Deen, and Laurence J. Marton failed to cite the retractions and retracted publications appropriately in their grant applications." In its report, OSI found that the quality of Tofilon's slides had so deteriorated that rescoring was not possible. They also found that Tofilon's methods caused overwhelming technical problems and that his failure to blind score the slides did not meet standards of good laboratory practice. However, OSI did not find sufficient evidence to warrant a further investigation.[8] OSI also found that short

7. The Office of Research Integrity is an "independent entity in the Department of Health and Human Services," 42 U.S.C. § 289b. ORI replaced the Office of Scientific Integrity ("OSI") "which oversees the implementation of all PHS policies and procedures related to scientific misconduct; monitors the individual investigations into alleged or suspected scientific misconduct conducted by institutions that receive PHS funds for biomedical or behavioral research projects or programs; and conducts investigations as necessary." 42 C.F.R. § 50.102. In this case, the OSI conducted the investigation, but the ORI issued the final report.

8. Under the applicable regulations, the grantee institution has the primary responsibility for in-

vestigating allegations of scientific misconduct and is required to establish internal procedures for conducting such inquiries. 42 C.F.R. §§ 50.103, 50.104. If an allegation of misconduct arises, the grantee institution must conduct an inquiry. 42 C.F.R. § 50.103(d)(1). The institution must then report the results to the ORI and make a recommendation to the ORI about whether an investigation is warranted. 42 C.F.R. § 50.103(d)(1), (4), (6). ORI may seek additional information before addressing the recommendation of the institution. 42 C.F.R. § 50.104(a)(6). ORI reserves the right to perform its own investigation. *Id.* Here, UCSF and the M.D. Anderson Cancer Centers conducted inquiries and submitted reports to OSI finding

delays or failure to cite retractions did not meet the definition of scientific misconduct.

The defendants assert that because the United States is the real party in interest, *see United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center*, 961 F.2d 46, 50 (4th Cir.1992), its admissions in the ORI report show that there is no dispute between the plaintiff and defendants. The defendants also argue that the ORI report was an adjudication under the Administrative Procedure Act, 5 U.S.C. § 551(7), and therefore that the decision is entitled to preclusive effect under the doctrines of res judicata or collateral estoppel. Milam takes the position that the ORI report is not a binding judicial admission and neither res judicata nor collateral estoppel apply to give it preclusive effect and that, in any event, the prejudice to her from the report outweighs any probative value it may have.

■ The Court first notes that because ORI did not conduct a hearing and because the parties did not have an opportunity to litigate the issue before ORI, its findings are not entitled to preclusive effect. *See United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966); *Delamater v. Schweiker*, 721 F.2d 50, 53–54 (2d Cir.1983). Instead, ORI reviewed the determinations of UCSF and the University of Texas, performed some additional inquiry, and agreed with the universities' conclusions that further investigation was not warranted. The Court further notes that the level of intent required for ORI to proceed with an administrative action is intentional falsification, a higher level of intent than that required under the False Claims Act. *See, e.g. In the Matter of Dr. Rameshwar K. Sharma*, DAB Decision No. 1431 (Aug. 6, 1993); Dan L. Burk, *Research Misconduct: Deviance, Due Process, and the Disestablishment of Science*, 3 Geo.

Mason Indep.L.Rev. 305, 336–37 (1995). Because a claim could be actionable under the False Claims Act, and not actionable under ORI regulations, the issue is not identical.

■ On the other hand, the Court finds that the report is admissible under Rule 801(d)(2)(A) of the Federal Rules of Evidence and that its probative value is not substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. The report is relevant and highly probative in that it is a detailed report, written by a scientific oversight agency, on the precise issue before this Court. In fact, it would be hard to conceive of a more probative piece of evidence. Milam claims that the report is unduly prejudicial because (1) it is merely a review of UCSF's decision not to investigate and (2) Milam was not adequately consulted by ORI. The Court is cognizant of these limitations but finds that the ORI report is simply one item, among many, of probative evidence in this highly contested case.

V

The basis for this scientific dispute to be even potentially cognizable in federal court is that the funding for the Brain Tumor Research Center has come primarily from federal grants. At issue in this case are twenty-four grant applications submitted by defendants from 1982 through 1989.[9]

The grant submission process requires an applicant to submit a research plan which includes the goals of the research, the significance of the research, the preliminary studies that have been undertaken, the credentials of the researchers, and a bibliography of relevant literature. The applicant must also submit a proposed budget in detail for the first twelve months and the projected budget required for completion of the project. Type

---

that there was no scientific misconduct. OSI requested additional information; interviewed Milam, Tofilon, Deen, Marton, Wolff, and Bodycote; and interviewed three non-party experts in the field to assist in its determination. On April 26, 1994, ORI issued a report agreeing that no further investigation was warranted.

9. The following grants are alleged to contain false statements: CA13525–11S1, CA13525–11, CA13525–12, CA13525–13, CA13525–14, CA13525–15, CA13525–16, CA13525–17, CA13525–18; CA37606–01, CA37606–02, CA37606–03, CA37606–04, CA37606–05; CA42779–01, CA42779–02, CA42779–03, CA42779–04; CA41757–01, CA41757–02, CA41757–03; CA09215–05, CA09215–06, CA09215–07.

grant applications are submitted for the original project and are selected on a competitive basis. Type 2 grant applications are for continuing research and compete only with other applicants for continuing funds. Type 5 grant applications are non-competitive continuing grant applications which are given to applicants for a set term during which requests for continuation are made on an annual basis. Type 2 and 5 grant applications require progress reports in which the principal investigator provides NIH with an appraisal of the progress of the research.

All grant applications must be signed by the principal investigator or the program director who accepts responsibility "for the scientific conduct of the project." All applications are also signed by a representative of the institution who certifies that the statements in the application are true to the best of the signer's knowledge.

According to Milam, the experiments were not conducted in accordance with scientific method, a standard of conducting research used to ensure reliable results. In particular, Milam alleges that Tofilon conducted experiments without controls. She also claims that he failed to follow the protocol referenced in his articles and selectively chose data. Finally, she argues that the fact that she could not replicate his experiments renders them invalid. Defendants, on the other hand, argue that all of Milam's accusations amount to no more than "her claim that the research at issue fell below acceptable scientific norms."

## VI

Before addressing the claims, the Court must resolve the issue of subject matter jurisdiction as to ten of the allegedly false statements. Defendants assert that ten of the grant applications involve information the government had before the filing of the suit. *See* Amended Complaint Paragraphs 79, 80, 82, 86, 100, 104, 126, 130, 131, 132. Before 1986, the False Claims Act stated:

> Unless the Government proceeds with the action, the court shall dismiss an action brought by the person on discovering the action is based on evidence or information

the Government had when the action was brought.

31 U.S.C. § 3730(b)(4). This language was held to bar *qui tam* suits even if the information was supplied to the government by the person who filed suit. *United States ex rel. Lapin v. International Business Machines Corp.*, 490 F.Supp. 244 (D.Haw.1980). Here, Milam provided all the relevant information to the government on July 17, 1989. Furthermore, Marton and Deen had already given the government the same information in October, 1987, and in March, 1989.

Under the 1986 amendments, it is the public disclosure of information on which the case is based, rather than the government's awareness of that information, which bars a *qui tam* relator's suit. *See* 31 U.S.C. § 3730(e)(4) (1988). Defendants seek to use the pre–1986 statute to bar the claims of which the government was aware before Milam filed suit. Milam notes that her disclosure to the government did not take place until 1989, well after the 1986 amendments were enacted. She claims that there is no basis for applying the pre–1986 law to post–1986 conduct on the part of the plaintiff. The Ninth Circuit agreed in a recent case, stating

> Retroactive application of a law means that it changes the legal consequences of conduct that took place before the law went into effect. If, however, the law changes the legal consequences of conduct that takes place after the law goes into effect, the law operates on that conduct prospectively. That is, so long as Congress establishes the legal consequences of conduct prior to the conduct taking place, there is no issue of retroactivity.

*United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 814 (9th Cir. 1995). The Court adopts the reasoning of the Ninth Circuit and finds that it has subject matter jurisdiction over the disputed claims.

## VII

The California defendants also maintain that one of Milam's claims should be barred by the pre–1986 statute of limitations. *See* Amended Complaint Paragraph 130. Before

the 1986 amendments, the statute of limitations was six years from the date of the violation. 31 U.S.C. § 3731(b) (1983). Since the passage of the 1986 amendments, an action may not be brought more than six years after the violation nor

> more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed.

31 U.S.C. § 3731(b) (1995). The suit was filed on February 14, 1990, but Paragraph 130 refers to a statement made in a grant application dated April 21, 1982. Therefore, under the pre–1986 statute of limitations, the claim would clearly be barred. Under the post–1986 statute of limitations, the claim would be barred unless an official of the United States did not learn of it until after February 14, 1987.

■■■ "[C]ourts presented with this issue have recognized [that] applying a new or amended statute of limitations to bar a cause of action filed after its enactment, but arising out of events that predate its enactment, generally is not a retroactive application of the statute." *Vernon v. Cassadaga Valley Central School District,* 49 F.3d 886, 889 (2d Cir.1995). This is because procedural rules

generally affect secondary rather than primary conduct. *See Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1502, 128 L.Ed.2d 229 (1994). The Court finds that retroactive application of the statute of limitations does not impair any right possessed by the defendant and, therefore, the Court will apply the amended statute of limitations. Neither party suggests that the claim is barred by the post–1986 statute of limitations, so the Court will address this claim below.

## VIII

With this background, the Court can now proceed to detail Milam's various claims. Milam alleges that the California defendants have made forty-seven false statements in the twenty-four grant applications. The statements can be broken down into five different types of statements.

■■■ Eight of the statements can be classified as listings of journal articles written by Tofilon.[10] According to Milam, if information in a published article is false, then every citation to that article is a false statement under the False Claims Act. However, the False Claims Act only creates liability for false statements, not for accurate citations. In *Williams v. United States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982), the Supreme Court overturned a conviction for false statements [11]

---

10. Paragraph 79 states that in grant application CA 13525–11S1, dated May 10, 1982, Marton "relies upon and cites" an article written by Tofilon, later published in *Science* 217:1044 (1982) that contains false data. The paragraph goes on to report that the article was retracted in *Science* 244:631 (1989). Paragraph 80 states that in grant application CA 13525–11, dated January 18, 1983, Marton once again cites *Science* 217:1044 (1982) which contains false data. Paragraph 82 states that in a progress report for grant application CA 13525–12, dated January 6, 1984, Marton cites the following Tofilon articles containing false data: *Cancer Research* 43:3576 (1983); *Science* 222:1132 (1983); *Radiation Research* 97:171 (1984); and *Radiation Research* 99:165 (1985). In Paragraph 88, Milam states that Marton "cites numerous articles at page 114 of [grant application CA 13525–13] that contain false data." The paragraph cites *Science* 217:1044 (1982), *Science* 222:1132 (1983), *Cancer Research* 43:3576 (1983), and *Radiation Research* 97:171 (1984). Paragraph 103 states that

Marton cites *Science* 217:1044 (1982) in grant application CA 37606–01. In Paragraph 116 Milam states that in grant application CA 42779–01, Deen cites "the following articles that contain false data: *Science* 217:1044 (1982); *Radiation Research* 97:171 (1984); *Radiation Research* 99:165 (1984), and *Science* 222:1132 (1983)." Paragraph 117 states that in grant application CA 42779–01, Deen cites *Science* 217:1046 (1982), *Radiation Research* 97:171 (1984), *Radiation Research* 99:165 (1984), and *Science* 222:1132 (1983). Finally, Paragraph 131 states that UCSF employees cite and rely upon the false Tofilon data in grant application CA 09215–07, dated March 28, 1995.

11. The defendant in *Williams* was convicted of a violation of 18 U.S.C. § 1014 which made it a crime to "knowingly mak[e] any false statement ... for the purpose of influencing in any way the action" of a federally insured financial institution. *See Williams,* 458 U.S. at 282, 102 S.Ct. at 3090.

based on check-kiting, where the only alleged false statement was depositing a check that had insufficient funds to back it up. As the Court stated,

> that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false."

*Id.*

Here, even assuming *arguendo* that the articles contained inaccurate information, there is no dispute that the articles actually were published in the cited journals. Perhaps False Claims Act liability for mere citations could be imposed if the citations themselves were fabricated. However, in this case, Milam is attempting to bootstrap her substantive complaints about defendants' research into additional claims for citations. The Court finds as a matter of law that a citation of an article, which actually was published, cannot be the basis for False Claims Act liability. Therefore, the Court will grant summary judgment for defendants on Paragraphs 79, 80, 82, 88, 103, 116, 117, and 131.

 Ten statements make claims to the effect that DFMO-induced polyamine depletion increases the number of DNA cross-links, and that interaction between x-rays and BCNU increases the cytotoxicity of BCNU and can be detected at the chromosomal and macromolecular levels.[12] Milam claims that these statements are false because her experiment produced a 30 percent increase in cross-links rather than the 93 percent reported by Tofilon in the article he published. However, the statements do not quantify the increase and thus are factually correct, even if Milam got different results. The Court also notes that in the *Science* 222:1132 (1983) article, Tofilon stated "the crosslinking factor was approximately 34 percent greater than that obtained with BCNU alone." In any event the Court finds, as a matter of law, that False Claims Act liability cannot be imposed on the basis of a literally true statement. Milam has not submitted a

scintilla of evidence to show that defendants did not observe an increase in cross-linking and, therefore, the Court will grant summary judgment for defendants on Paragraphs 83, 84, 87, 90, 102, 114, 115, 118, 126, and 130.

 Eleven of the statements are omissions rather than statements.[13] Defendants claim that, in each case, they were either not required to provide the omitted information, or that they had already submitted the omitted information. The False Claims Act does not impose liability for omissions unless the defendant has an obligation to disclose the omitted information. In *United States v. Board of Education of Union City*, 697 F.Supp. 167, 175 (D.N.J.1988), the Court ruled that three of the government's claims could not be sustained because the claims were merely based on the absence of supporting documentation. The Court stated "nothing is supplied to show that these documents were required or that their absence renders a claim to be false." *Id.* at 175 n. 9.

 The False Claims Act includes no duty to disclose certain information. *See* 31 U.S.C. § 3729. Here, defendants argue that they had no statutory or regulatory obligation to discuss the implications of retractions. Rather, they point out that the Public Health Service places strict limitations on the length of grant applications. Furthermore, under 42 C.F.R. § 50.103(d)(4), a grantee need not inform the Public Health Service of problems with data unless, after a formal inquiry, the grantee institution determines that a formal investigation is warranted. After Milam filed charges against Marton and Deen in 1987, UCSF undertook an inquiry and determined that there was no need to progress to a formal investigation. In addition, for renewal applications, an applicant need only advise NIH of publications that have not been previously reported to NIH. Defendants maintain that because the Selby retraction was reported to NIH the month it was submitted for publication, there was no need to include it on the application form. The Court will address each of the eleven alleged omissions in turn.

---

12. *See* Complaint, Paragraphs 83, 84, 87, 90, 102, 114, 115, 118, 126, and 130.

13. *See* Complaint Paragraphs 91, 93, 95, 96, 97, 107, 119, 121, 123, 127, and 132.

In Paragraph 91, Milam states that in application CA 13525–15, dated March 24, 1987,

> Marton fails to disclose that the data previously cited in NIH grant applications for CA 13525 were erroneous. The application states that "[o]ur theoretical studies of polyamine/DNA interactions continue".... Defendant Marton omits any reference to previously cited data, without explanation, and Marton fails to state that he no longer is pursuing his stated research plan. Defendant Marton's failure to disclose the falsity of Tofilon's data is a material omission.

However, she has submitted no evidence to suggest that the studies of polyamine/DNA interaction were not continuing or any evidence that Marton had changed his research plan. In addition, she has offered no reason why the omission of previously cited data would be a false statement. Finally, in May, 1987, Selby had just informed Deen of the problems with the radiation/SCE study. Deen then instructed Selby to send the slides to Tofilon for recounting and they were rescored in June, 1987. Thus, as of March, 1987, defendants did not have sufficient information to require that they submit it to NIH. Therefore, the Court will grant summary judgment for defendants with respect to this claim.

Paragraph 93 states that in grant application CA 13525–16, dated February 24, 1988, Marton failed to inform NIH of the false Tofilon data and the planned retraction. However, according to PHS Form 2590 (9/86), a grantee is only required to advise NIH of publications submitted during the prior year. Milam's retraction was not submitted until May 8, 1988, and, in fact, it was never published. The Selby retraction was not published until July, 1988, but NIH was informed of the retraction in November, 1987. Thus, the Court will grant summary judgment for defendants on Paragraph 93.

Paragraph 95 states that in grant application CA 13525–17, dated March 14, 1989, Marton failed to discuss or explain the Milam retraction that had been submitted to *Science*, even though Deen did cite it. The Court finds, as a matter of law, that a correct citation cannot constitute a false claim, even if relator would have preferred more in depth discussion of the citation. Summary judgment will be entered for defendants on Paragraph 95.

In Paragraphs 96, 121, and 123, relating to applications submitted in 1988 and 1989, Milam claims that defendants failed to cite the Selby retraction, which was published in July, 1988. However, the PHS regulations only require a grantee to inform NIH of publications not previously reported. The Selby retraction was included in the Selby termination notice which was submitted to NIH in November, 1987. In essence, Milam is claiming that the citation to the retraction came in the wrong submission. While it might have been preferable for defendants to include the Selby retraction in each successive grant application, it simply was not required by law and, therefore, its omission cannot form the basis of a claim under the False Claims Act. The Court will thus grant summary judgment for defendants on Paragraphs 96, 121, and 123.

Paragraph 97 states that in grant application CA 13525–18, dated May 16, 1989, Marton and Deen do not inform NIH that prior studies used a cell line that may have had "mycoplasma contamination." Defendants simply had no statutory, regulatory, or fiduciary obligation to inform NIH of possible contamination in a relatively brief description of their research. Summary judgment will be entered for defendants on this claim.

Paragraph 107 states that in grant application CA 37606–03, dated June 2, 1986, Marton "fails to disclose the false Tofilon data." As noted above, there was no evidence that Tofilon's data was false in 1986 and, therefore, no obligation to report it. At most, one researcher had obtained different results. Likewise, at Paragraph 119, Milam alleges that in grant application CA 42779–02, dated April 3, 1987, Deen fails to disclose the false Tofilon data concerning x-irradiation. Once again there is no evidence that, at that time, defendants had a statutory duty to disclose this information. Similarly, in Paragraph 127, Milam states that in applica-

tions CA 41757–02 and 41757–03, dated September 23, 1987, and September 28, 1988, respectively, Feuerstein failed to disclose the problems researchers were having in replicating the Tofilon results. Because Milam has failed to show any statutory or fiduciary obligation to make these disclosures, the Court will grant summary judgment for defendants on Paragraphs 107, 119, and 127.

■ Finally, in Paragraph 132, Milam claims that under grants CA 09215–05, –06, and –07, Tofilon was supposed to investigate drug-radiation interactions, but that he was reassigned for a period to do other research and NIH was never informed of his reassignment. Because there was no prohibition on Tofilon's working for another faculty member, there was no obligation to inform NIH of this fact. Summary judgment will thus be entered on this trivial allegation in Paragraph 132.

Ten allegations in the amended complaint concern statements in grant applications that suggest that the research plan has not changed from the previous application. For example, in Paragraph 92, Milam alleges that in grant application CA 13525–16, Marton stated that the "objectives and specific aims are essentially the same as those originally proposed." Paragraph 94 reveals that grant application CA 13525–17 reported "no change" in research plans for the next year. In Paragraph 91,[14] Milam claims, *inter alia,* that in grant application CA 13525–15, Marton failed to state that he no longer is pursuing his previously stated research plan. Paragraph 104 shows that in grant application CA 37606–02, Marton once again reported "no change" in the project goals and that the project would continue as "originally planned." In Paragraph 105, Milam claims that in grant application CA 37606–03, Marton stated there was no change in the goals and that studies would continue as planned. Paragraph 109 indicates that in grant application CA 37606–04, Marton stated that the studies would continue "as originally planned." Paragraph 110 shows that Marton reported "no change" in research plans in

grant application CA 37606–05. Paragraph 120 states that Deen reported "no change" in grant application CA 42779–03. Paragraph 122 shows that Deen reported no change in grant application CA 42779–04. Finally, Paragraph 128 shows that in grant application CA 41757–02, defendant Feuerstein states that his research will continue "as described in the original plan."

■ Milam argues that the no change statements are false, because "any time the Defendants stated that there was 'no change' in their objectives and aims, they were making a false statement because they knew that they 'were continuing' research that they had not in fact done, 'to repeat' results that they had never obtained." Second, she claims that "Defendants have known that their objectives were not supportable and therefore could not remain the same." Defendants assert that generally statements as to future plans cannot form the basis of False Claims Act liability. In any event, Public Health Service guidelines allow an investigator to "make significant changes in methods or procedures" without prior approval. PHS Grants Policy Statement 46 (Jan. 1, 1987). However, Milam cites the same policy statement which also states that the grantee must gain prior approval for significant changes in the objectives or purposes of the project. She alleges that the retractions were significant changes in the direction and objectives of the project. Defendants point out that none of the referenced grant applications incorporated Tofilon's research as a primary aim. Because the Court finds that Milam has submitted no evidence that the "no change" statements were inaccurate, it will grant summary judgment on Paragraphs 91, 92, 94, 104, 105, 109, 110, 120, 122, and 128.

Finally, and perhaps most significant, are the nine statements that relate to defendants' scientific findings which relator believes are untrue. For example, in grant application 13525–11, Marton states "[i]n cells pretreated with DFMO and then treated with BCNU, the number of SCEs increased approximately two-fold over the number of SCEs in cells

---

14. Paragraph 91 includes allegations of two false statements, the other one of which has been

heretofore addressed in this Opinion.

**886**

treated with BCNU alone." Milam claims that this statement in Paragraph 81 is false. In Paragraphs 86, 89, and 101, Milam makes identical allegations.

In Paragraph 85, the alleged false statement is that DFMO pretreatment increased BCNU-induced damage to chromosomes. In Paragraph 100, the alleged false statement is that DFMO alone did not induce SCEs above control levels. In Paragraph 106, Milam claims that "Marton implies ... that the drug R,R,-MAP is unlike DFMO because R,R,-MAP does not enhance BCNU-induced SCEs." In Paragraph 108, the alleged false statement is "R,R,-MAP does not increase BCNU-induced sister chromatid exchanges as previously reported for DFMO." Milam claims that this statement is false because Marton should have known that the previously reported DFMO data was false. Finally, in Paragraph 111, Milam alleges that Marton stated "DFMO treatment had always served as our benchmark for polyamine inhibition." She claims that he should have disclosed that the DFMO data was false.

 As the Ninth Circuit stated in *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992):

> Proof of one's mistakes or inabilities is not evidence that one is a cheat.... Without more, the common failings of engineers and other scientists are not culpable under the Act.... The phrase "known to be false" ... does not mean "scientifically untrue"; it means "a lie." The Act is concerned with ferreting out "wrongdoing," not scientific errors.... What is false as a matter of science is not, by that very fact, wrong as a matter of morals. The Act would not put either Ptolemy or Copernicus on trial.

Here, Milam claims that Tofilon's results are false because he employed practices that irreconcilably deviated from those that are commonly accepted within the scientific community and because she was unable to replicate those results. However, several other scientists were able to replicate Tofilon's results. Furthermore, in the BCNU/DFMO SCE assay, Milam altered the protocol and added a rinse step. The testimony of the undisputed pioneer in developing that test shows that the addition of a rinse step fundamentally alters the process.

 At most, the Court is presented with a legitimate scientific dispute, not a fraud case. Disagreements over scientific methodology do not give rise to False Claims Act liability. *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815–16 (9th Cir.1995); *United States ex rel. Wang v. FMC Corp.*, 975 F.2d at 1421. Furthermore, the legal process is not suited to resolving scientific disputes or identifying scientific misconduct. As a recent law review article stated,

> The discord between the scientific and legal approaches to misconduct is well illustrated by the efforts of federal agencies to settle upon a proper definition of "misconduct." ... The division between misconduct and legitimate science may be difficult to distinguish, and not even a *mens rea* requirement such as "deliberate falsification" is sufficient to adequately distinguish the two. For example, consider the problem of selective reporting of data. The scientific report is by no means a stenographic or historical description of the research completed, nor is it meant to be. The scientist chooses carefully and deliberately what aspects of his research deserve to be reported. In doing so, he exercises the creativity that lies at the heart of science.... The essence of scientific genius is the ability to choose what ought to be included in the model, and what ought to be left out.

Dan L. Burk, *Research Misconduct: Deviance, Due Process, and the Disestablishment of Science*, 3 Geo. Mason Indep.L.Rev. 305, 333–334 (1995).

In any event, Milam's claim that Tofilon's practices deviated from scientific norms are unsupported by any expert testimony. In fact, there is no support in the record for her contentions that Tofilon's experiments did not comply with scientific method. Not one deposition states that data was juggled or manipulated. Defendants, on the other hand, have submitted testimony to show why Milam failed to replicate Tofilon's results, and they have submitted testimony to show

that failure to replicate is a normal part of the scientific process. Therefore, the Court will grant summary judgment for defendants on these claims as well.

## IX

■ Defendants argue that even if the statements were not scientifically true, relator has not presented any evidence that the defendants "knowingly" submitted false claims. Negligence or mistake are not grounds for liability under the False Claims Act. *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991).

The actual level of knowledge required here is a subject of disagreement between the parties. In 1986 Congress amended the False Claims Act. In those amendments, Congress clarified the level of intent necessary to be held liable for a False Claims Act violation. Prior to 1986, the statute held liable one who "knowingly presents, or causes to be presented, to an officer or employee of the Government or a member of the armed forces a false or fraudulent claim for payment or approval," or "knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved." 31 U.S.C. § 3729(1), (2) (1982). The 1986 amendments defined the term "knowingly" to include "reckless disregard" or "deliberate ignorance." 31 U.S.C. § 3729(b). *See Wang v. FMC Corp.*, 975 F.2d at 1420 (9th Cir. 1992). Defendants argue that this heightened standard should not apply to them. Relator, and the United States, as an amicus curiae, assert that courts had not consistently interpreted the requisite intent and that, therefore, defendants had no legitimate expectation of any particular level of intent. *See, e.g., United States v. Davis*, 809 F.2d 1509, 1512 (11th Cir.1987) (requiring proof that defendant acted with the specific intent to deceive the government); *United States v. Hughes*, 585 F.2d 284, 287–88 (7th Cir.1978) (intent to deceive not required); *United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47, 60 (8th Cir.1973) (holding negligent misrepresentation sufficient); *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir.1972) (intent to deceive required); *United States v. Mead*, 426 F.2d 118, 122 (9th Cir.1970) (intent to deceive required); *Fleming v. United States*, 336 F.2d 475, 479 (10th Cir.1964), *cert. denied*, 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed.2d 795 (1965) (intent to deceive not required). Recently, the D.C.Circuit ruled that the knowledge requirement of the False Claims Act has never required a higher standard than "reckless disregard" or "deliberate indifference" for the submission of false claims. *See United States v. TDC Management Corp.*, 24 F.3d 292, 297 (D.C.Cir.1994). The Fourth Circuit has never addressed the issue.

■ A statute is not retrospective merely because the conduct at issue predates the statute, "[r]ather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Products*, —— U.S. ——, ——, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994). Here, the Court finds that the expanded definition of knowledge in the 1986 amendments did not attach new legal consequences to events taking place before the amendments were enacted. Because there was no uniformity in interpreting the meaning of the term "knowledge" before the 1986 amendments, defendants had no certainty about the consequences of their actions. The intent requirement would have differed depending on where the case was filed. In many circuits, the 1986 amendments would not have altered the definition of the term "knowledge." The Court agrees with the D.C. Circuit's ruling that knowledge never meant more than "reckless disregard" and, thus, the Court will apply that definition of knowledge to all claims in this lawsuit.

The Court must next address each defendant's knowledge. Charles B. Wilson is the director of BTRC and therefore was the principal investigator on grant CA 13525 and its renewals. However, CA 13525 was an umbrella grant which consisted of several distinct grants, with at least ten different principal investigators. Two of those investigators were Marton and Deen. Milam claims that because Marton and Deen made various of the above statements in the grant

applications, Wilson also knowingly made those statements.

■ Wilson signed the applications as the director of BTRC, not as a researcher. He testified in his deposition that he had not even heard the name Tofilon until 1991 and had no knowledge of any dispute over Tofilon's research. However, he met with Deen and Marton on a weekly basis regarding their research. Likewise, there is no evidence that Wilson acted in reckless disregard or with deliberate ignorance of the truth or falsity of the statements in the grant applications. As Director of BTRC, he relied on the principal investigators beneath him to account for the accuracy of the grant applications. Wilson is a surgeon, not a laboratory scientist and, as director of a large research institution, he was entitled to delegate responsibility for scientific accuracy to his subordinates who are trained scientists and researchers. Because Milam has not submitted a scintilla of evidence showing that Wilson knowingly submitted false statements to NIH, the Court will grant summary judgment for Wilson on all counts.

■ Burt Feuerstein is the principal investigator of grant CA 41757. He did not supervise Tofilon, Milam or Selby. He may have been at laboratory meetings when Milam shared her data with other researchers. Milam only makes three allegations that concern Feuerstein in the amended complaint. See Amended Complaint, Paragraphs 124–28. In 1985, Feuerstein stated that "DFMO pretreatment followed by treatment with BCNU or cisplatinum also alters the expression of sister chromatid exchange (79), [and] formation of crosslinks (80)." Defendants proffer that Wolff's research shows that this statement is entirely true and that, even if it were not, Feuerstein had no knowledge of Tofilon's research problems. In 1985 Milam first reported her problems with replicating Tofilon's work. The full extent of her concerns were not revealed until January, 1986. Thus, it would have been impossible for Feuerstein to know in 1985 of Milam's concerns.

Milam also alleges that in subsequent Type 5 grant applications submitted in 1987 and 1988, Feuerstein failed to disclose the problems with Tofilon's data. But Feuerstein was not obligated to report to NIH problems that other people have had in replicating the work. Only a brief description of the research is required for renewal of the grant. See PHS form 2590. Finally, Milam alleges that Feuerstein falsely stated that the research would continue "as described in the original plan." As the Court has already ruled, a true statement of future plans cannot form the basis of False Claims Act liability. Because there is no evidence that Feuerstein knowingly submitted any false claim, the Court will enter summary judgment for him on all counts.

■ In addressing the allegations against defendants Marton and Deen, the Court notes that Milam has not submitted any evidence that *anyone* was aware of any problems with Tofilon's research before 1985 and, therefore, it is impossible that Marton or Deen "knowingly" made false statements before 1985. In 1985, Marton and Deen were aware of the fact that Milam was having difficulty replicating Tofilon's work. Marton and Deen encouraged Milam to continue her work, despite her desire to stop. The evidence simply cannot support a conclusion that they acted in reckless disregard for the truth; instead, the undisputed evidence shows that they sought to uncover the truth. By 1986, defendants had involved other researchers in resolving the problem. On November 6, 1987, Milam agreed in the resolution of her formal complaint that Marton, Deen, and Tofilon had committed no fraud. By the relator's own admission, there was no evidence of misconduct prior thereto.

■ In October, 1987, Marton and Deen talked to officials at NIH about the problems they were encountering with some of Tofilon's data. NIH was also informed of the Selby retraction. While the government's knowledge of the problems with the research is not an absolute defense, it "may be relevant to a defendant's liability." *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1156–57 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); *see also United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421

(9th Cir.1991) (holding that "knowledge possessed by officials of the United States may be highly relevant. Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."); *Boisjoly v. Morton Thiokol, Inc.*, 706 F.Supp. 795 (D.Utah 1988) (dismissing False Claims Act count where the government was aware of the facts that allegedly made the claims false).

▓▓▓ Also a factor in the Court's decision as to whether to grant summary judgment for Marton and Deen on the issue of knowledge is the fact that there is no evidence that Tofilon's results were false. They were eventually replicated by Wolff, and to allow a jury to hold Marton and Deen liable for statements that may in fact have been true, seems anathema to the purposes of the False Claims Act. "For a *qui tam* action to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud." *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In this case, the Court finds that Marton and Deen's awareness of Milam's variant results was not sufficient as a matter of law to render their submissions to be false statements. The Court finds that it would be an unconscionable intrusion of law into academia to force a jury to decide whether Marton and Deen should have informed NIH of Milam's results sooner than 1987. Otherwise, scientists would be forced to disclose all varying results to NIH, no matter what indicia of credibility those results had. Accordingly, the Court will enter summary judgment for Marton and Deen on all claims.

▓▓▓ As for Tofilon, Milam asserts that he knowingly caused UCSF to submit grant applications that contained false statements. However, Milam has submitted no evidence to show that Tofilon knew his results were

erroneous. She states that she does not "have any personal knowledge as to Dr. Tofilon's intentions." In November, 1987, she agreed that he committed no fraud in the course of his research. Tofilon did not remove his laboratory notebooks or slides when he left BTRC. He also shared his data with his superiors at weekly meetings. The Court is satisfied that summary judgment must be granted for Tofilon on all claims.

▓▓▓ UCSF cannot be held liable for submission of false claims unless one of its employees knowingly submitted false claims. As this is not the case, summary judgment must be entered in favor of UCSF.

## X

Defendants M.D. Anderson Cancer Center and Philip J. Tofilon have incorporated by reference the summary judgment motion filed by the California defendants. However, they have raised one additional ground that the Court must address. Pursuant to 31 U.S.C. § 3730(b)(2), the False Claims Act mandates that

> [a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for 60 days, and shall not be served on the defendant until the Court so orders.

While Milam followed this procedure with the original complaint, when she amended the complaint to add the Texas defendants, she did not file the complaint in camera and under seal. Relying on authority from one district court which dismissed a complaint that was not filed in accordance with § 3730(b)(2), *see Erickson v. American Institute of Biological Sciences*, 716 F.Supp. 908, 911 (E.D.Va.1989), defendants seek dismissal of the amended complaint as to the Texas defendants.

▓▓▓ Relator points out that § 3730(b)(2) by its own terms applies only to "the complaint" and not to any amended complaint,

890

and that the *Erickson* case dealt with an original complaint and not with any subsequent amendments. In addition, relator notes that the purpose of the § 3730(b)(2) requirement is primarily to protect the interests of *qui tam* relators and the government. In particular, the provision was designed to allow the relator to file suit before informing the government of the basis of the suit. Otherwise, if the relator had to inform the government of the basis of the suit before filing suit, the government could file suit first and deprive the relator of his right to sue. S.Rep. No. 345, 99th Cong., 2d Sess., 24, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289. The other purpose of the provision is to give the government sufficient time to decide whether to intervene in the case. *Id.* The only way in which the filing requirements were intended to affect a defendant's rights is that the provision "correct[ed] a current anomaly, under which the defendant may be forced to answer the complaint 2 days after being served, without knowing whether his opponent will be a private litigant or the Federal Government." *Id.*

▮ Here, Milam followed the requirements of § 3730(b)(2) when filing the initial complaint. Neither the statute nor any relevant case law imposed upon her the duty to file any amendments to that complaint in camera and under seal. Likewise, there is no suggestion in the legislative history that the provision was intended to benefit the defendant in any way, except to inform the defendant whether its opponent is the relator or the federal government, an issue that had already been resolved in this case. Therefore, the Court will not grant summary judgment to the Texas defendants on this ground.

The Court will next address Paragraphs 133–146 of the Amended Complaint which relate solely to the Texas defendants. All of the statements in Paragraphs 133–146 fall into one of the five categories addressed by the California defendants' summary judgment and by the Court's discussion above.

Paragraphs 135 and 143 charged that while defendants made accurate citations to articles that were actually published, they allegedly contain false data. Because the Court has already ruled that there can be no False Claims Act liability for accurate citations, summary judgment will be granted to the Texas defendants on these claims.

▮ Paragraph 138 charges that defendants failed to acknowledge in grant application CA 46798–01A1, dated March 29, 1989, that the article in *Radiation Research* 97:171 was retracted by *Radiation Research* 115:187 which was submitted for publication in November, 1987, accepted for publication in February, 1988, and published in July, 1988. This retraction had been reported to NIH the month it was submitted for publication. Since, for renewal applications, an applicant need only advise NIH of publications that have not been previously reported to NIH, there was no need to include it on the application form.

▮ In Paragraphs 139 and 140, Milam recites that in correspondence to George Johnson, Program Director, Biochemistry and Pharmacology Grants, National Cancer Institute, dated March 24, 1989, Tofilon discussed the retraction of the *Science* articles, but failed to explain the reason for the retraction. Milam also alleges that he failed to discuss the *Radiation Research* retraction. There is simply no basis for imposing False Claims Act liability on the basis of a letter that discloses certain retractions but does not discuss them in detail sufficient to satisfy the relator. Paragraphs 136–138 also allege similar omissions. Summary judgment will be granted to the Texas defendants on the claims in Paragraphs 136, 137, 138, 139, and 140 as well.

Paragraphs 144 and 145 include statements that there is no change in the research plans. As the Court has already ruled, accurate statements as to future plans cannot be the basis of False Claims Act liability, and summary judgment will be entered for the Texas defendants on these claims.

Finally, Paragraph 146 states that Tofilon enclosed a manuscript with a grant application in 1986 that included his "false" data. There is simply no evidence that in 1986, Tofilon's data could be considered false.

For all of these reasons, the Court will enter judgment for M.D. Anderson Cancer Center and Philip J. Tofilon on all claims.

## XI

The California defendants have also filed a Motion for Judgment on the Pleadings in which they assert that enhanced penalties included in the 1986 False Claims Act Amendments should not be applied to acts or statements that took place before 1986. The 1986 Amendments increased the penalty for violations from double to treble the damages suffered by the United States. 31 U.S.C. § 3729 (1992). The Amendments also increase the penalty for each statement from $2,000 per claim to between $5,000 and $10,000 per claim. *Id.* Because the Court has granted summary judgment to all California defendants on all claims, the method for calculating damages is moot and the Motion for Judgment on the Pleadings will be denied as such.

For all of the foregoing reasons, the Court will deny as moot the Motion for Judgment on the Pleadings (Paper 77), grant the Motion for Summary Judgment or in the Alternative, Partial Summary Judgment (Paper 81) filed on behalf of the California defendants, and grant the Motion for Summary Judgment filed on behalf of the Texas defendants (Paper 82). A formal order will be entered in conformity with this Opinion.

## ORDER

In accordance with the Court's Opinion filed today in the above-captioned case, IT IS, this 6th day of October, 1995, by the United States District Court for the District of Maryland,

ORDERED:

(1) That the Motion for Judgment on the Pleadings (Paper 77) filed on behalf of defendants Regents of the University of California, Charles B. Wilson, Laurence J. Marton, Dennis F. Deen, Burt G. Feuerstein, and Philip J. Tofilon BE, and the same hereby IS, DENIED AS MOOT;

(2) That the Motion for Summary Judgment (Paper 81) filed on behalf of defendants Regents of the University of California, Charles B. Wilson, Laurence J. Marton, Dennis F. Deen, Burt G. Feuerstein, and Philip J. Tofilon BE, and the same hereby IS, GRANTED;

(3) That the Motion for Summary Judgment (Paper 82) filed on behalf of defendants University of Texas M.D. Anderson Cancer Center and Philip J. Tofilon BE, and the same hereby IS, GRANTED;

(4) That JUDGMENT BE, and the same hereby IS, ENTERED in favor of The Regents of The University of California, University of California, Brain Tumor Research Center, Charles B. Wilson, Laurence J. Marton, Dennis F. Deen, Burt G. Feuerstein, The University of Texas, M.D. Anderson Cancer Center, and Philip J. Tofilon against the United States of America.

## MEMORANDUM ORDER

Presently pending before the Court is relator Kathryn M. Milam's Motion for Reconsideration (Paper 108). On Friday, March 25, 1994, after a hearing, the Court denied relator's Motion to File Second Amended Complaint. Although she has alleged no new grounds, relator now seeks reconsideration of that ruling. In accordance with the Court's oral opinion and rulings rendered in open court at the conclusion of the hearing on Friday, March 25, 1994, IT IS, this 6th day of October, 1995, by the United States District Court for the District of Maryland,

ORDERED:

(1) That relator Kathryn M. Milam's Motion for Reconsideration (Paper 108) BE, and the same hereby IS, DENIED.