REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 1255

September Term, 2013

_____

PENNY McCRIMMON

v.

STATE OF MARYLAND

_____

Krauser, C.J.,
*Zarnoch,
Reed,

JJ.

_____

Opinion by Zarnoch, J.

_____

Filed:  October 27, 2015

* Zarnoch, Robert A., J., participated in the
conference of this case while an active member
of this Court; he participated in the adoption of
this opinion as a retired, specially assigned
member of this Court.

When a financial agent holding a power of attorney for a nursing home resident embezzles and misappropriates her charge's monies, including those intended to pay the facility's bills, is the nursing home transformed from a mere creditor to a "victim" for purposes of state restitution laws?  Under the circumstances of this case, we answer "no."

## BACKGROUND

This appeal arises from the 2012 conviction in the Circuit Court for Baltimore County of appellant Penny McCrimmon for embezzlement and misappropriation of funds by a fiduciary and from the court's sentence that included an order for restitution.

On March 31, 2011, the State filed a criminal information in the circuit court charging McCrimmon with three counts: theft of property valued at least $10,000 to $100,000, obtaining the property of a vulnerable adult, and fraudulent appropriation by a fiduciary of the victim's money or property (embezzlement).  The victim is appellant's cousin, Reginald Gant.  On January 18, 2012, appellant pleaded guilty to the third count, and the State agreed to enter a nolle prosequi on the remaining two charges.

The prosecutor's recital of the facts at the guilty plea hearing included the following:

> STATE:  Mr. Gant ... would identify Penny McCrimmon, seated next to Mr. Smith here in Court, they are first cousins. What Mr. Gant would have testified today, if he was called to testify, was that between April the 1st of 2010 and February the 17th of [2011], while he was residing at the Chapel Hill Nursing Home, which is located over in the Randallstown area of Baltimore County.  That during that time period that he had given Ms. McCrimmon a Power of Attorney.  ... The Power of Attorney granted her ability to manage his funds. He was in a very bad medical condition ... and he relied upon Ms.

McCrimmon during that time. He entrusted her with his money and that she was going to use it as intended, to take care of his medical bills and for his benefit.

It turned out that appellant was collecting Gant's income, but diverting this money for her own benefit, and not paying Gant's bills. According to the prosecutor:

> [The victim's] money then . . . flowed, moved by Ms. McCrimmon into the other account, the 3979 account, at which time she then spent it and she didn't spend it on Mr., Mr. Gant during this time period, but instead, she went to McDonald's [and other retailers, and] she ... spent that money. Now, this continued each month until February of 2011 and if called to testify, Mr. Gant would indicate that she did not have permission to spend this money this way. He had not given her permission to spend it for her own personal gain.

Mr. Gant eventually realized that his obligation to Chapel Hill was not being met.

> He owed a bill of $19,718. The original bill actually was much, much larger and Mr. Ryan Evans is here from Chapel Hill, he was a former administrator there, he worked with Mr. Gant during this time period and he was familiar with Ms. McCrimmon as well. He had spoken to Ms. McCrimmon and Ms. McCrimmon said that she was, in fact, spending down his money so that he could qualify for medical assistance. He didn't really get into that but he knew that this bill was large and looming. The bill originally was, I think, in the forties and they agreed to reduce the amount to $19,718. That's the bill that Mr. Gant owes today. That bill has never been paid by Ms. McCrimmon. She never used any of his money for that purpose and, again, because of what the evidence is from the banking statements, she used it for her own personal gain in violation of the trust that she was given by Mr. Gant.

The prosecutor introduced into evidence a number of documents. The first was a

fill-in-the-blank "Durable Unlimited Power of Attorney" form.[1]  The document spoke in general terms of the financial agent's power to act with regard to Gant's financial and business transactions, but did not mention Chapel Hill or a duty to pay the nursing home. This instrument was dated June 8, 2010, just two months after Gant's admission to Chapel Hill.  It was witnessed by two employees of the Home: a licensed social worker associate (LSWA) and an administrator of the facility.   The second document was a "Maryland Advance Directive: Planning for Future Health Decisions" ("Advance Directive").  It was also dated June 8th and named McCrimmon as health care agent for Gant.  It was witnessed by the LSWA, who also attested to Gant's competence.  The final document was a "Revocation of Power of Attorney" and Appointment of Healthcare Agent, dated February 4, 2011 and also witnessed by the LSWA.

Gant was also called as a witness.  When the court asked if there was anything he wanted to say, he responded, "It's just that I have a bill to pay, you know, and I'm going to do it, I'm going to pay it. . . ."

The circuit court accepted the plea and sentenced appellant to five years' incarceration, suspended in favor of five years of unsupervised probation.  The court also

---

[1] This instrument was apparently authorized by then §§ 13-601 et seq. of the Estates & Trusts ("ET") Article of the Maryland Code (1974, 2001 Repl. Vol.).  Those provisions were repealed, effective October 1, 2010, and replaced by the Maryland General and Limited Power of Attorney Act, Md. Code (1974, 2011 Repl. Vol., 2014 Supp.), ET §§ 17-101 et seq., Chapters 689 & 690, Laws of 2010.  Code of Maryland Regulations 10.07.02.08-1A.(5) requires a "comprehensive or extended care facility" to recognize the authority of a power of attorney.

ordered appellant to pay restitution to Chapel Hill Nursing Home in the amount of $19,718.73.[2]

On December 17, 2012, appellant filed a petition for post-conviction relief. On July 10, 2013, the circuit court granted the petition in part and allowed appellant leave to file a belated application for leave to appeal. All other relief was denied. After the application was filed in this Court and the State responded, this Court, on September 10, 2014, transferred the case to the direct appeal docket.

## QUESTIONS PRESENTED

1. Whether the Chapel Hill Nursing Home was an entity entitled to restitution in this case?

2. Whether the circuit court erred in failing to address whether McCrimmon had the ability to pay restitution before ordering her to do so?

3. Whether there was sufficient evidence to justify a restitution award of $19,718?

We answer the first question in the negative and need not address the last two issues. However, because Gant was clearly a victim entitled to restitution, which he apparently would seek to redirect to Chapel Hill, we remand for further proceedings on the issue of restitution.[3]

---

[2] The circuit court indicated that if McCrimmon paid the restitution within 90 days, it would consider staying the guilty finding and giving the appellant probation before judgment. This did not happen.

[3] As discussed at p. 12 *infra*, should restitution be awarded to Gant and he is so inclined, he may want to voluntarily assign that judgment to Chapel Hill.

## DISCUSSION

### Standard of Review

An appellate court reviews the circuit court's restitution order for an abuse of discretion. *Silver v. State*, 420 Md. 415, 427 (2011). However, if an order of restitution is illegal in any respect, we review it as a matter of law. *See* Md. Rule 4-345(a) ("The court may correct an illegal sentence at any time"); *Carlini v. State*, 215 Md. App. 415, 443 (2013). When we interpret a statute, we review that legal question *de novo*. *Maryland-Nat'l Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 181 (2006) (citing *Moore v. State*, 388 Md. 446, 452 (2005)).

In *Blue v. Prince George's County*, 434 Md. 681, 689 (2013), the Court of Appeals described our process for determining legislative intent:

> Our colleagues on the Court of Special Appeals have aptly summarized this quest, based on this Court's past decisions, as one that requires an examination of the statutory text in context, a review of legislative history to confirm conclusions or resolve questions from that examination, and a consideration of the consequences of alternative readings. Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality.

(Internal quotation marks and citations omitted).

### Analysis

Restitution, as applied in a criminal case under Maryland's Criminal Procedure

Article, is a criminal sanction, not a civil remedy. It serves at least three distinct purposes. First, it is a form of punishment for criminal conduct. Second, it is intended to rehabilitate the defendant. Lastly, it affords the aggrieved victim recompense for monetary loss. *Pete v. State*, 384 Md. 47, 55 (2004) (Citations omitted). The "predominant and traditional purpose" of restitution is to "reimburse the victim for certain kinds of expenses . . . incurred as a direct result of the defendant's criminal activity." *Chaney v. State*, 397 Md. 460, (2007). Because restitution statutes are penal in nature, they must be strictly construed. *Addison v. State*, 191 Md. App. 159, 180 (2010) (citing *In re John M.*, 129 Md. App. 165, 185 (1999)).

Restitution is governed by Title 11, subtitle 6 of the Criminal Procedure Article ("Crim. Proc."), Md. Code (2001, 2008 Repl. Vol., 2014 Supp.), §§ 11-601 *et seq.* We focus on three sections in this subtitle.

Section 11-601(j) defines a "Victim" as:

(1) a person who suffers death, personal injury, or property damage or loss *as a direct result of a crime* or delinquent act; or
(2) if the person is deceased, the personal representative of the estate of the person.

(Emphasis added).

Under § 11-603(a):

A court may enter a judgment of restitution that orders a defendant or child respondent to make restitution in addition to any other penalty for the commission of a crime or delinquent act, if:
> (1) *as a direct result of the crime* or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased;
> (2) *as a direct result of the crime* or delinquent act, the victim

6

suffered:

       (i) actual medical, dental, hospital, counseling, funeral, or burial expenses or losses;
       (ii) direct out-of-pocket loss;
       (iii) loss of earnings; or
       (iv) expenses incurred with rehabilitation;

(3) the victim incurred medical expenses that were paid by the Department of Health and Mental Hygiene or any other governmental unit;

(4) a governmental unit incurred expenses in removing, towing, transporting, preserving, storing, selling, or destroying an abandoned vehicle as defined in § 25-201 of the Transportation Article;

(5) the Criminal Injuries Compensation Board paid benefits to a victim; or

(6) the Department of Health and Mental Hygiene or other governmental unit paid expenses incurred under Subtitle 1, Part II of this title.

(Emphasis added).

Finally, § 11-606(a) states:

The court may order that restitution be paid to:

(1) the victim;

(2) the Department of Health and Mental Hygiene, the Criminal Injuries Compensation Board, or any other governmental unit;

(3) *a third-party payor*, *including*:
       (i) an insurer; or
       (ii) *any other person that has, under Part I of this subtitle*:
              1. *compensated the victim for a property or pecuniary loss*; or
              2. *paid an expense on behalf of a victim*;

(4) any person for whom restitution is authorized by law; or

(5) *a person who has provided to or for a victim goods, property, or services for which restitution is authorized under § 11-603 of this subtitle.*

(Emphasis added).

Emphasizing the restrictive language of these provisions, particularly the "direct

7

result" requirement and the express inclusion in § 11-603 and § 11-606 of specific creditors, Maryland appellate courts have held that the creditors of a victim are generally not entitled to restitution. *In re Ryan S.*, 369 Md. 26, 56 (2002); *Breakfield v. State*, 195 Md. App. 377, 396-402 (2010); *Chilcoat v. State*, 155 Md. App. 394, 413-14 (2004).

In this case, Chapel Hill is, in a general sense and possibly in common parlance, a victim of McCrimmon's embezzlement. But under the tailored definitions and "carefully constructed" language of § 11-601(j) and § 11-603(a), *In re Ryan S.*, 369 Md. at 56, is a nursing home—which is also clearly a creditor of a "direct" victim—itself a "victim" under the restitution statute?

In many respects, the nursing home here appears to be more than a mere creditor. Even on the sketchy record before us, it is obvious that Chapel Hill's thumbprints are all over the form that made McCrimmon Gant's financial agent. Both the Durable Unlimited Power of Attorney Form and the Advance Directive were witnessed by an employee or employees of Chapel Hill, most likely at the facility. And it is safe to say that absent Gant's admission to the nursing home, such forms would have never been executed and the opportunity to embezzle would have never been presented. Significantly, as the Attorney General told residents in his consumer manual on nursing homes:

> If you have a financial agent, that person must pay the nursing home using your resources. The agent does not accept personal responsibility for your debts, but does accept responsibility to use your resources to pay your debts.

8

Attorney General's Office, *Nursing Homes: What You Need to Know*, at 42-43 (2012).[4]

Similarly, the Attorney General's manual goes on to note:

> If you are a nursing home resident's financial agent, you must use the resident's money appropriately. *In most cases,* this means using their money to pay for the resident's nursing home care. If you are a financial agent, you should not use the resident's money for your personal benefit.

*Id.* at 44 (Emphasis added).[5]  Adding to this description of industry practices is the fact that Gant apparently wants the nursing home to be paid for its services.

On the opposite side of the ledger, the Durable Unlimited Power of Attorney Form speaks in the most general terms of the financial agent's duties with respect to Gant's financial and business transactions and does not specifically mention obligations to the nursing home.  This document does not treat a nursing home any differently from any other debtor of Gant that McCrimmon was authorized to pay.  Under these circumstances, to treat a nursing home as an entity suffering loss as a "direct result" of the embezzlement—even if Gant consented to the restitution order—would eviscerate the

---

[4] The Attorney General's manual also states:

> If a financial agent is managing your funds, the nursing home *may* require that person to agree to use your resources to pay for nursing home services.

*Id.* at 42 (Emphasis added).  The record is silent on whether such an agreement was entered into by McCrimmon.

[5] The manual goes on to discuss the financial agent's responsibility when the resident applies for Medicaid.  *Id.* at 44-45.  Once again, the record tells us virtually nothing about McCrimmon's actions regarding Medicaid.  For a description of a financial agent's duties in this regard, see Maryland Code (1982, 2009 Repl. Vol., 2014 Supp.),

(Continued…)

9

clear text of the restitution statutes. Nor would such a construction further the purpose of the restitution statutes.

The restitution statutes do not make a Maryland court a collection agent for any indirect losses suffered by a direct victim. *See In re Tyrell A.*, 442 Md. 354, 372 (2015) (Section 11-601 "limits victims for purposes of restitution generally to only those injured as a direct result of the acts that made the conduct illegal"); *Pete*, 384 Md. at 61 ("The General Assembly has required a direct result between the qualifying crime committed and the damages inflicted before restitution may be ordered"); *id.* at 66 ("[T]he General Assembly crafted explicit statutory requirements allowing restitution under limited circumstances").

In addition, given this limited purpose of the restitution statutes, the exclusion of Chapel Hill as a direct victim does not lead to an absurd or unreasonable result. Perhaps, the outcome would be different if any and all victims and creditors were the beneficiaries of the statute. However, that is not the case. In our view, the nursing home is not included in the statutory definition of "victim" under the restitution laws.

Alternatively, the State argues that restitution would be authorized by CP § 11-606(a)(3) as a "third-party payor" who "compensates" the victim for pecuniary loss or pays "an expense" on behalf of a victim. As fetching as is this contention, we note that Chapel Hill, while it may have lost revenue, did not "pay" anything. In our opinion, this

_____

(…continued)
Health General Article § 19-344(c).

10

provision is not triggered in this case.

To leave no stone unturned, we turn to § 11-606(a)(5), which authorizes restitution to a person who has provided to a victim "services for which restitution is authorized under § 11-603 of this subtitle." Clearly, Chapel Hill is an entity that has provided services to Gant, the victim here. However, this provision goes on to point us in the direction of 11-603(a). And the statutory categories of restitution beneficiaries listed there do not include a general creditor such as Chapel Hill.[6]

For these reasons, we conclude that the $19,718 restitutionary order cannot stand. The State has requested that if we vacate the restitution order, then the case should be remanded for a correct determination of the amount of restitution.[7] On remand, McCrimmon is also free to urge the court to find under § 11-605(a)(1) that she does not have the ability to pay the judgment of restitution. Finally, because Gant has previously

---

[6] This language was added to the law in 2006 at the request of the Committee to Revise Article 27. *See* Chapter 429, Laws of 2006. Although the title to the measure states that the bill is "expanding the list of persons to whom a court is authorized to order restitution," nothing in the text or legislative history of the statute indicates that this change was intended to benefit a general creditor such as Chapel Hill.

[7] In the State's brief, the Attorney General states:

> If . . . this Court decides Chapel Hill was not a proper restitution recipient, then McCrimmon is correct that the amount she stole from Gantt is the proper measure of the amount restitution. Thus, should the case be remanded for re-sentencing, the State may introduce evidence of that amount so that the restitution order may be adjusted (up or down) accordingly.

(Citations omitted).

11

indicated that he wants to see Chapel Hill's bill paid, the State may seek a restitution order for Gant as a true victim of McCrimmon's offence. And, if he so chooses, the victim may assign the judgment to Chapel Hill as provided in Maryland Rule 2-624. *See also* 46 Am. Jur. 2d Judgments § 431 (2015). Of course, he is under no obligation to make such an assignment.

**ORDER OF RESTITUTION VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR RE-SENTENCING AND FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY BALTIMORE COUNTY.**